1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KARRIE A. CHAVEZ,

11              Plaintiff,                    No. CIV S-08-0691 EFB

12        vs.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
14
                Defendant.                   ORDER
15   _____/

16          Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

17   ("Commissioner") denying her application for Supplemental Security Income under Title XVI of

18   the Social Security Act ("Act").  For the reasons discussed below, the court denies plaintiff's

19   motion and grants the Commissioner's cross-motion.

20   I.  BACKGROUND

21          Plaintiff, born September 6, 1968, formally applied for Supplemental Security Income

22   ("SSI") on July 29, 2005.  Administrative Record ("AR") 48-51.  His application was denied on

23   January 6, 2006, on the basis that lacked the requisite disability.  *Id.* at 41-45.  He requested

24   reconsideration which was denied on March 30, 2005.  *Id.* at 34-39.  On May 22, 2005, he

25   requested a hearing which was held before administrative law judge ("ALJ") Daniel G. Heeley

26   on July 25, 2007.  *Id.* at 313-37.  Plaintiff was represented by counsel at the hearing, and testified

                                              1

1  along with witness Kimberlyn Straws and vocational expert George Meyers.  *Id.*

2      The ALJ issued a decision on October 18, 2007, finding that plaintiff is not disabled.[1]  *Id.*

3  at 11-21.  The ALJ made the following specific findings:

4          1.  The claimant has not engaged in substantial gainful activity
           since July 29, 2005, the application date (20 CFR 416.920(b) and
5          416.971 *et seq.*).

6          2.  The claimant has the following severe impairments: seizure
           disorder, depression, and anxiety (20 CFR 416.920(c)).

7

8          3.  The claimant does not have an impairment or combination of
           impairments that meets or medically equals one of the listed
           impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
9          416.920(d), 416.925 and 416.926).

10                              ***

11         4.  After careful consideration of the entire record, the undersigned
           finds that the claimant has the residual functional capacity to
12         perform medium work except the claimant cannot climb ladders,

13  _____

14     [1]  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C.
    §§ 1382 *et seq.*  Disability is defined, in part, as an "inability to engage in any substantial
15  gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42
    U.S.C. § 1382c(a)(3)(A).  A five-step sequential evaluation governs eligibility for benefits under
    the SSI program.  *See* 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 and 416.971-76; *Bowen v.*
16  *Yuckert*, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

17         Step one:  Is the claimant engaging in substantial gainful activity?  If so,
    the claimant is found not disabled.  If not, proceed to step two.
18         Step two:  Does the claimant have a "severe" impairment?  If so, proceed
    to step three.  If not, then a finding of not disabled is appropriate.
19         Step three:  Does the claimant's impairment or combination of
    impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P,
20  App.1?  If so, the claimant is automatically determined disabled.  If not, proceed
    to step four.
21         Step four:  Is the claimant capable of performing his past work?  If so, the
    claimant is not disabled.  If not, proceed to step five.
22         Step five:  Does the claimant have the residual functional capacity to
    perform any other work?  If so, the claimant is not disabled.  If not, the claimant
23  is disabled.

24  *Lester v. Chater,* 81 F.3d 821, 828, n.5 (9th Cir. 1995).

25      The claimant bears the burden of proof in the first four steps of the sequential evaluation
    process.  *Bowen*, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential
26  evaluation process proceeds to step five.  *Id.*

ropes, and scaffolds; cannot have contact with hazards such as
heights and moving machinery; can perform simple, routine tasks;
can have occasional public contact; and cannot perform jobs with
high productions quotas.

\*\*\*

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on September 6, 1968 and was 36 years
old, which is defined as a younger individual age 18-49, on the
date the application was filed (20 CFR 416.963).

7.  The claimant has a limited education and is able to
communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant
does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience,
and residual functional capacity, there are jobs that exist in
significant numbers in the national economy that the claimant can
perform (20 CFR 416.960(c) and 416.966).

\*\*\*

10.  The claimant has not been under a disability, as defined in the
Social Security Act, since July 29, 2005, the date the application
was filed (20 CFR 416.920(g)).

*Id.* at 16-20.

Plaintiff requested that the Appeals Council review the ALJ's decision.  *Id.* at 10.

However, on February 8, 2007, the Appeals Council denied review, leaving the ALJ's decision

as the "final decision of the Commissioner of Social Security." *Id.* at 6-8.

II.  MEDICAL EVIDENCE

October 9, 2005 Social Security Consultative Medical Evaluation – Amil Garg, M.D.

On October 9, 2005, Dr. Amil Garg diagnosed plaintiff with:

1.      Seizure disorder, both grand mal and petit mal.
2.      Panic attacks and possible underlying depression.
3.      Feet pain, likely plantar fasciitis.

AR 121.  Plaintiff reported having an average of 2 seizures per week.  AR 118.  Dr. Garg noted

that plaintiff was on medications for her seizures, which helped but did not "control them fully."

3

1  AR 118.

2      Dr. Garg opined that plaintiff "should be able to stand and walk for about six hours in an

3  eight-hour workday with breaks on account of her foot pain"; "there is no limitation in [her]

4  sitting"; she "should be able to lift 50 pounds occasionally and 20 pounds frequently"; "[t]here

5  are no postural limitations"; she "should be able to bend, stoop, and crouch"; she "should be able

6  to do reaching, handling, feeling, grasping and feeling"; she "has workplace limitations of not

7  being able to drive because of her frequent seizures, and she should not work at heights or

8  operate heavy machinery because of her seizures"; and "[t]here are no visual or communicative

9  limitations."  AR 121-22.

10      <u>October 15, 2005 Social Security Consultative Psychiatric Evaluation – Mandeep
         Behniwal, M.D.</u>

11

12      On October 15, 2005, Dr. Mandeep Behniwal diagnosed plaintiff as follows:

13          Axis I:      Adjustment disorder with depressed mood.
                         Rule out major depressive disorder.
14                       Methamphetamine dependence in complete sustained remission.
                         Alcohol dependence in complete sustained remission, per claimant.
15          Axis II:     No diagnosis.
            Axis III:    As in Medical History.
16          Axis IV:     Moderate: Health issues, financial.
            Axis V:      GAF: 55.[2]

17

18  AR 126.  Dr. Behniwal noted that plaintiff was on medications, but that she was not receiving

19  any "current psychiatric followup."  AR 124.  Dr. Behniwal opined that plaintiff's "problems

20  seems to be treatable and the likelihood of recovery within the next 12 months is fair."  AR 126.

21  *////*

22

23      [2] Global Assessment of Functioning ("GAF") is a scale reflecting the "psychological,
    social, and occupational functioning on a hypothetical continuum of mental health-illness."
24  American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, 34
    (4th ed., Text Revision, 2000) ("DSM IV-TR").  A GAF of 51-60 indicates moderate symptoms
25  (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in
    social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers).
26  *Id.*

Dr. Behniwal further opined that plaintiff "seemed to be capable of managing her funds to the best of her interest"; "does not have any drug problems and can do simple calculations"; has "the ability to perform simple and repetitive tasks and can perform detailed and complex tasks also"; "should be able to accept instructions from her supervisors and she may have mild difficulty interacting with coworkers and the public"; "will also have moderate difficulty performing work activities on a consistent basis and maintaining regular attendance in the workplace and completing a normal workday/workweek, and in dealing with the usual stress encountered in competitive work." AR 127.

<u>Other Medical Evidence</u>

On August 17, 2005, Nurse Practitioner Marsha Rickard at Los Molinos Family Health Center assessed plaintiff as having "a history of seizure disorder, under fair control previously with self-medication of Neurontin and Mysoline" and a "history of mental disorder." AR 145. She stated that the plan was to refill plaintiff's medications and "get a sleep depravation EEG" and neurology and mental health referrals. AR 145.

A laboratory report dated August 19, 2005 reflected that plaintiff had an elevated Glucose, Serum count of 121 H, with normal being 65-99. AR 142. An August 24, 2005 EEG report was normal. AR 141.

On August 25, 2005, plaintiff went to Tehama County Health Services Agency to seek mental health services. AR 182. She was interviewed by a Marriage and Family Therapist Intern ("MFTI"). AR 184. Plaintiff reported that she had been on medications in the past, that the medications were "effective," and that she had no in-patient hospitalizations or psychotherapy. AR 182.

On October 19, 2005, Nurse Practitioner Marsha Rickard reflected an assessment of Trichomonas and "Seizure disorder that is under fair control." AR 131. Plaintiff reported that she had experienced a seizure three weeks prior "but that was not unusual for her." AR 131.

////

Ms. Rickard stated that the plan was to "continue to try to get her in to neurology [and] maintain her medications." AR 132. Plaintiff was to "keep track of any kind of breakthrough seizures." AR 132.

In a December 9, 2005 Mental Residual Functional Capacity Assessment, non-examining state agency physician E.A. Harrison, M.D., opined that plaintiff was not significantly limited or was moderately limited in her understanding and memory, sustained concentration and persistence, social interaction, and adaptation. AR 150-51. Dr. Harrison further opined that based on the review of the existing record evidence, by July 1, 2006, plaintiff "will be able to sustain, adapt to, and persist/perform [simple repetitive tasks] w/ limited interacting w/ coworkers & public." AR 152. He added that plaintiff was "less than fully credible" because of her inconsistent statements concerning her drug and alcohol history. AR 152. On March 17, 2006, non-examining state agency physician David Gross, M.D., reviewed the record evidence and concurred with Dr. Harrison's opinion. AR 154.

In a December 28, 2005 Physical Residual Functional Capacity Assessment, non-examining state agency physician S.A. Jaituni, M.D., opined that plaintiff could occasionally lift and/or carry 50 pounds; could frequently lift and/or carry 25 pounds; could stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; had an unlimited ability to push and/or pull; had no postural limitations except that she could not climb ladders/ropes/scaffolds; had no manipulative limitations, visual limitations, or communicative limitations; had no environmental limitations except that she should avoid even moderate exposure to hazards such as machinery or heights. AR 169-73. In considering the reliability of plaintiff's subjective symptoms, Dr. Jaituni stated "Not fully credible. Evidence does not support severity alleged. ? compliance." AR 173. On March 22, 2006, non-examining state agency physician P. Suster, M.D., reviewed the record evidence and concurred with Dr. Jaituni's opinion. AR 175.

////

1        On February 17, 2006, plaintiff was interviewed by a social worker ("MSW") at Tehama

2    County (Mental) Health Services Agency.  AR 177-80.  Plaintiff reported that she was

3    "experiencing audio hallucinations"; that "[t]he voices really get to [her] and they make [her]

4    cry"; that "[t]he voices are getting a lot worse"; that she has panic attacks when she is startled or

5    when there is really loud sounds that take her by surprise; that her anxiety is okay unless it is

6    triggered as described above; that she has visual hallucinations in the afternoon when she is

7    trying to settle in for sleep; that since she was nine years old she has seen the same thing: when

8    she closes her eyes, a picture of a mountain starts to form, she is climbing it, men start coming at

9    her, and she ends up "chopping them into pieces and burying the parts all over the mountain";

10   and that she has chronic insomnia.  AR 177-80.  The assessment reflected that plaintiff's

11   insight/judgment were "fair" and that client had the following functional limitations: "Client

12   appears to have a difficult time managing her personal affairs (i.e. housing, maintaining income,

13   etc.).  Client is homeless [and] cannot hold a job. [Client is] dependent on her mother & friends

14   for her family's support. [Client's] anxiety makes it difficult for her to function in social settings

15   with groups of people, noisy environments."  AR 180.  The social worker gave the following

16   DSM-IV Impression:

17            Axis I:        298.9 psychosis d/o NOS (by hx)
                              309.81 PTSD, chronic (by hx)
18            Axis II:       no DX.
              Axis III:      seizure disorder, chronic
19            Axis IV:       B,C, D, E, F, G, I
              Axis V:        GAF = 30, past year GAF = 30.
20

21   AR 180.

22        On March 17, 2006, plaintiff reported to physician's assistant Max Hemping at Tehama

23   County Health Services Agency that she was having breakthrough seizures.  AR 199.  Mr.

24   Hemping's Assessment/Plan stated: "Seizure Disorder.  Mysoline 240 mg 1 tid.  Neurontin 300

25   mg. 1 tid.  Note to Social Services to try to provide some sort of medical coverage for medicines

26   as soon as possible.  Follow her or ER if any breakthrough seizures."  AR 199.  From April

                                                  7

through May 2006, plaintiff attended group therapy at Tehama County (Mental) Health Services Agency from April through May 2006, and attended follow-up visits through January 2007.  AR 266-69; 258-65.

Records from Saint Elizabeth Community Hospital document plaintiff's emergency room visits from November 2006 through March 2007 for seizures.  AR 207, 215, 219, 230-31.

On January 12, 2007, plaintiff received treatment at Enloe Medical Center.  AR 293.  She reported that she was having about four seizures per month and had chronic back pain.  She stated that she had a seizure the night before which aggravated her back pain.  *Id*.

Treatment notes from Enloe Medical Center dated January 30, 2007 reflected that plaintiff reported that she had been having 2-3 seizures a month over the last year and had been tried on a variety of medication to try and control the seizures.  AR 291.  Plaintiff reported having seizures as frequently as once or twice a week but never went a month without having a seizure.  Among other things, she was assessed with "poorly controlled grad mal seizure disorder."  *Id*.

Treatment notes from Enloe Medical Center dated February 12, 2007 reflected that plaintiff reported having approximately six seizures in January.  AR 288.  Those record include the assessment of "probably seizures in spite of negative 2005 electroencephalogram, gastroesophageal reflux disease, water retention, insomnia, arthralgias, asthma, and tobacco addiction."  *Id*.

A mental health assessment dated March 14, 2007 noted that plaintiff's mood was "anxious," her thought content "obsessing" on "disturbing thoughts," and her sleep pattern was "interrupted."  AR 253.  The notes described plaintiff's limitations and vulnerabilities as: "emotionally withdrawn and defensive.  Socially isolated, poverty."  *Id*.  Her functional impairments were listed as: "unable to work, problems with social environment and ADLs."  AR 254.  The "Supporting Diagnosis Criteria" stated: "A/H, intrusive memories, flashbacks, SI, no plan/intent, isolative, angry outbursts, hyper vigilant, increased startle reactions, panic attacks,

1  lethargy, decreased self esteem, negative self talk, nightmares, feeling overwhelmed." *Id.*
2  Plaintiff was assessed with an Axis I diagnosis of PTSD and Major depression and a GAF score
3  of 55. *Id.*

4          On March 15, 2007, Matthew Merliss, M.D., evaluated plaintiff at the request of nurse
5  practitioner Renee Carini. AR 275-77. Dr. Merliss diagnosed "Refractory seizures" and
6  recommended referral to an epilepsy center as well as trying different medications. AR 276-77.

7          On April 4, 2007, an EEG was performed at Dr. Merliss's request, but it yielded normal
8  results. AR 272 (noting sinusitis and that "brain is within normal limits"). On April 26, 2007,
9  Ms. Carini summarized plaintiff's recent medical evaluations and diagnosed "Intractable
10 epilepsy." AR 284.

11         Mental health treatment notes from Tehama County (Mental) Health Services Agency
12 dated May 14, 2007 reflected that plaintiff reported difficulty sleeping and that she "takes meds
13 as prescribed." AR 307.

14         An Annual Medical Service Plan from Tehama County (Mental) Health Services Agency
15 dated July 9, 2007 reflected an Axis I diagnosis of PTSD and Major Depression recurrent with a
16 GAF of 55. AR 305.

17 III.  SUMMARY OF TESTIMONY AT ADMINISTRATIVE HEARING

18         Plaintiff, witness Kimberlyn Straws (plaintiff's sister), and vocational expert, George
19 Meyers, testified at plaintiff's July 25, 2007, hearing. Plaintiff testified that she was born
20 September 6, 1968, only completed the ninth grade, but could do simple reading and writing.
21 AR 316-317. She testified that she was currently living with her sister, Ms. Straws. AR 317.
22 She testified that she did not have a driver's licence and that the only time she ever drove had
23 been in 1988 when she "wrecked into a house." AR 318. She testified that she walked and if it
24 was too far to walk, took public transportation or got a ride. *Id.* She testified that she received
25 food stamps and general assistance and that the last time she had worked was in 1993 for one
26 month at a convalescent home. AR 318-19. She testified that she had done no other work and

9

did not believe there were any jobs she could now perform on a full time basis.  AR 319.

Plaintiff testified that her mental disorder, grand mal seizures, and pinched nerves in her spine kept her from working.  AR 320.  She confirmed that she took medication to help with her seizures, panic attacks, and hearing voices and did not currently have any side effects.  AR 321. She reported that she currently had 5-7 seizures per month.  *Id*.  Although she did not know exactly what brought them on, she stated "[s]ometimes if I get upset, or sometimes, yeah, if it's hot, or what, and then just sometimes, just because.  And then sometimes, because of my menstrual period."  *Id*.  She explained that she usually did not go to the emergency room when she had a seizure, because her family knew what to do.  AR 321.  She stated that the last time she had gone to the emergency room was the last month.  AR 321-22.  She testified that she suffered from asthma and had cut down on her smoking to one half of a pack per day.  AR 322. She confirmed that she did not drink alcohol and did not use any kind of illegal drug.  AR 322-23.

Plaintiff testified that she suffered from panic attacks and heard voices.  AR 323.  She explained that "I hear them mostly at night, like before I'm going to bed.  I hear voices telling me, you know, to kill people, and stuff like that."  *Id*.  She testified that she had been hearing voices "since I was real little, like six years old."  AR 324.  Plaintiff said that talking to the therapist at mental health "helps a little bit, and the medicine that she put me on kind of helps a little bit, but it's still there."  *Id*.  When asked what brought on her panic attacks, plaintiff reported "[j]ust getting upset and stressed" . . . "[i]t's like a certain situation, like if – like, family problems, or someone makes me upset, or something, and then I end up having a panic attack, and – just go into it, and it takes a while for me to come out of it."  *Id*.

Plaintiff stated that she had three children, ages 23, 19, and 15.  AR 325.  She testified that none of her children lived with her and explained that the youngest was living with an aunt in San Diego.  *Id*.  She estimated that she took the bus to see her daughter in San Diego about every three months.  AR 325-26.

////

1    When asked if she had any hobbies that she could still do, plaintiff replied that making

2    crafts "like gluing the things on wicker baskets and stuff." AR 327. She estimated that she spent

3    "maybe a couple of hours" a week on her crafts. *Id*. She testified that she liked board games

4    like scrabble and monopoly but was "not too good, but kind of." AR 328. She stated that she

5    did not use a computer, did not attend religious gatherings, but sometimes went to family

6    barbeques. *Id*. She testified that she went food shopping once a month. *Id*. She stated that she

7    helps wash dishes, cuts food, and cooks. AR 329.

8    Attorney Grogan then asked plaintiff's sister, Ms. Straws, a few questions. He explained

9    that she had already submitted a letter describing her sister's seizures so would not go into that.[3]

10   AR 330. Ms. Straws testified that she would like to add to her sister's testimony that: "her panic

11   attacks increased after she was in the fire, the house fire, and ever since then, with the way – her

12   appearance and her seizures have just overwhelmed her life, and there – she can not function as a

13   normal person." *Id*.

14   Ms. Straws explained that plaintiff's 15 year old daughter was living with relatives in San

15   Diego because "right now, my sister is homeless, in between homes, because she does not have

16   her SSI, and it's better where she is, in a stable environment and going to school." *Id*. Ms.

17   Straws also testified that she assisted her sister with "everything, sir. I assist with getting her out

18   of the seizure. When she does have them she has to lay flat like I explained in the letter. It takes

19   _____

20   [3] The letter states:

21   I have seen my sister have her seizures since she was a child. Over the years they
     have become worse and more severe. And also more frequent. When her seizure

22   starts her head turns right to left, her eyes roll or fix in place and her body stiffens
     and jerks and she falls flat. She starts choking on her tongue and biting it. Fluids

23   protrude out her mouth. She urinates all over herself and loses her bowels. This
     lasts any where from 3-15 minutes sometimes longer depending on the seizure.

24   She does not know when it is coming or when she has even had one. After one
     she sleeps for hours. Her body is full of bruises and pain. It is a horrible sight

25   and also very dangerous. It scares away family and friends. I pray for her daily.

26   AR 114.

her hours to come back, you know, out of it.  Then she has to sleep.  I assist her with that.  I assist her with all her medical appointments.  I keep a planning calendar for her.  I make sure she gets to her appointments, in between me and her daughter.  I have helped her financially for the last two years. . . . and I make sure that her prescriptions are filled."  AR 331-32.  She confirmed that plaintiff experienced seizures "five to seven times a month, it has been lately."  AR 332.  When asked what she thought brought them on, she stated "everything that she told you sir.  Her menstrual periods, stress, and then at times, it just comes.  And the medication does not stop them."  *Id*.

The ALJ then posed two hypothetical questions to the VE.  In the first hypothetical the ALJ asked the VE to:

> Please assume this person could, because of unpredictable seizure occurrences, sit, stand, walk less than even two hours each in a normal eight hour workday, lift and/or carry less than 10 pounds even occasionally, never climb, balance, stoop, kneel, crouch, or crawl, and could not deal with normal work stress required of a 40 hour per week full-time.  Would there be any jobs that could be done, in your opinion?

AR 334.  The VE testified "no, your honor."  AR 334.

In the second hypothetical, the ALJ asked the VE to:

> [P]lease further assume that this individual could sit, stand, walk six out of eight hours each in a normal eight hour workday, lift and/or carry a maximum of 55 pounds occasionally, 25 pounds frequently, who could never climb ladders, ropes, or scaffolds, who would have to avoid even moderate exposure to hazards such as moving, dangerous machinery and unprotected heights. And who could work at jobs involving simple, routine tasks with occasional public contact, but no high volume production line jobs with high quotas. . . . Would there be any jobs that could be done in the California economy [by] a person with those limitations, in your opinion?

AR 334-35.  The VE testified that such a person would be able to perform the jobs of office help, 239.567-010, housekeeper, 323.687-014, and addresser 209.581-010.  The VE further testified that his testimony was consistent with the DOT.  When questioned by Attorney Grogan, the VE testified that no more than two absences per month, and two breaks per day would be tolerated

12

by an employer.  AR 336.

IV.  <u>ISSUES PRESENTED</u>

Plaintiff contends that the Commissioner committed three principal errors in sustaining the ALJ's determination that she is "not disabled."  First, the ALJ failed to properly evaluate plaintiff's seizure disorder under Listing 11.02.  Second, the ALJ failed to credit plaintiff's and third party statements as to the nature and extent of her pain and functional limitations, as required by law.  Third, the ALJ failed to properly assess plaintiff's residual functional capacity and as a result failed to pose a legally adequate hypothetical to the vocational expert.

V.  <u>LEGAL STANDARDS</u>

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied.  *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive.  *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is more than a mere scintilla, but less than a preponderance.  *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278  F.3d 947, 954 (9th Cir. 2002).

////

1    VI.   <u>ANALYSIS</u>

2         A.      <u>Plaintiff's Seizure Disorder and Listing 11.02</u>

3         Plaintiff contends that step three of the sequential evaluation process required the ALJ to

4    evaluate whether plaintiff's impairments met or equaled one of the sets of medical signs,

5    findings and symptoms found in the Social Security Regulations' Listing of Impairments

6    ("Listing") at 20 C.F.R. Pt. 404, Subpt. P, App.1 - Listing of Impairments.  Pl.'s Mot. for Summ.

7    J. at 18.  Plaintiff contends that the ALJ erred by finding that none of plaintiff's impairments met

8    "the criteria of any of the listed impairments," AR 14, even though the medical evidence

9    documented that her seizure disorder met or equaled the requirements of Listing 11.02.  Plaintiff

10   further contends that the ALJ thoroughly discussed whether her mental disorder met or equaled a

11   listing but failed to even *mention* her seizure disorder, even though her attorney specifically

12   argued in his briefs that her impairments met the criteria of Listing 11.02.

13        Defendant counters that plaintiff bears the burden of proving that her impairment meets

14   or equals a specific impairment in the Listing, and that plaintiff has failed to meet that burden.

15   Def.'s Mot. for Summ. J. at 7.  Specifically, defendant contends plaintiff failed to show that her

16   seizure disorder met or equaled Listing 11.02 because she has not established the existence of

17   epilepsy; she has not identified any medical evidence of "serum drug levels," as required by the

18   Listing; and, to the extent that she asserts that her seizure disorder was equivalent to Listing

19   11.02, she has failed to establish such equivalence.  *Id.* at 8-9.

20        The Listing of Impairments sets forth impairments and combinations of impairments that

21   are so severe as to be considered presumptively disabling, without further consideration of a

22   claimant's residual functional capacity, past relevant work, or other jobs.  20 C.F.R.

23   §§ 404.1520(d), 416.920(d); *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990).  In order for a

24   claimant's impairment(s) to meet or equal a listed impairment, all of the requirements of that

25   listing must be met.  *Key v. Heckler*, 754 F.2d 1545, 1550 (9th Cir. 1985).

26   ////

Listing 11.02 sets forth the criteria for finding a claimant presumptively disabled based on epilepsy.  Listing 11.02 provides:

> Epilepsy--convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.
>
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
>
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R., Appx. 1, Part 404, Subpart P, Regulations No. 4, Listing 11.02.

Listing 11.00A further provides that:

> Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. . . . When seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels. . .

*Id.*, Listing 11.00A.

As defendant points out, "[w]hile the record evidence contains many references to seizures and diagnoses of seizure disorders, no treating or examining physician diagnosed epilepsy as an explanation for the seizures."  Def.'s Mot. for Summ. J. at 8.  Nurse practitioner Farini is the only health care professional to diagnose epilepsy, but she was not an "acceptable medical source" who could provide evidence to establish an impairment.  *See* 20 C.F.R. § 416.913(a) (2008); *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996) (stating that "a nurse practitioner working in conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner working on his or her own does not").  Here, the physician upon whom nurse practitioner Farini relied, Dr. Merliss, specifically diagnosed plaintiff as having "Refractory seizures," not epilepsy.  AR 276.  Although Dr. Merliss speculated as to possible

1  causes for plaintiff's seizures and recommended referral to an epilepsy center with further

2  diagnostic studies, plaintiff was never diagnosed with epilepsy.  Moreover, there is no indication

3  in the record that plaintiff's serum drug levels were ever monitored or that plaintiff's impairment

4  persists despite the fact that she was following prescribed *antiepileptic* treatment.

5       Further, "[a]ccording to Social Security Ruling (SSR) 96-6p, when the ALJ determines

6  that an individual's impairment is not equivalent to any listing, the ALJ may satisfy the duty to

7  receive expert opinion evidence into the record by obtaining the signature of a state medical

8  consultant on the appropriate form (Disability Determination and Transmittal Form,

9  SSA-831-U5)."  *Castaneda v. Astrue*, Slip Copy, 2009 WL 2778043, at *1 (9th Cir. Sep. 2,

10  2009).  Here, the record contains two "Disability Determination and Transmittal" forms, dated

11  January 14, 2006 and March 30, 2006, in which physicians Elizabeth Harrison, M.D. and Sudhir

12  A. Jaituni, M.D., and physicians David Gross, M.D. and P. Suster, M.D., determined that

13  plaintiff is not disabled, necessarily concluding that plaintiff does not meet or equal in severity

14  the criteria for any list impairment in Appendix 1.  AR 32, 30.  Accordingly, plaintiff is not

15  entitled to relief on this ground.

16       B.    Failure to Credit Plaintiff's and Third Party's Testimony

17       Plaintiff further contends that the ALJ erred by discrediting her testimony and the

18  testimony of her sister, Kimberlyn Straws.  Pl.'s Mot. for Summ. J. at 21.

19            1.    Plaintiff's Testimony

20       In determining plaintiff's RFC, the ALJ stated the following with regard to plaintiff's

21  credibility:

22            The claimant alleges disability due to epilepsy, auditory
             hallucinations, burns, panic attacks, and back problems.  In a
23            seizure questionnaire, the claimant reported that she experienced
             two to three seizures a month and that it took two to three days to
24            recover from each episode.  She stated that her seizure medications
             provided "so-so" control.  In an appeals form, the claimant noted
25            more frequent hallucinations and dreams and a worsening of panic
             attacks.  She also indicated that her seizures were more frequent.

26

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  The claimant told an examining physician that she engaged in the following activities: cooking, vacuuming, mopping, and helping her mother with the groceries. The claimant told another examiner that she took care of her own personal hygiene needs, cared for her children, watched television, cleaned, did dishes, did laundry, and shopped when necessary. The doctor noted that the claimant could concentrate and read magazines.  The physician stated that the claimant played board games and socialized with friends and family.  The examiner also indicated that the claimant was able to finish the interview in a timely manner.

AR 18 (internal citations omitted).  The ALJ then went on to state that plaintiff's claims "are

simply not consistent with the preponderance of the opinions and observations by medical

doctors in this case."  AR 19.  The ALJ cited, and gave substantial weight to, Dr. Jaituni's

finding that plaintiff had a seizure disorder but "could perform work tasks at the medium

exertional level with seizure precautions including no climbing ladders, ropes, and scaffolds, and

avoiding even moderate exposure to hazards such as machinery and heights" and to Dr.

Harrison's conclusion that by July 2006, the claimant would be able to sustain, adapt to, and

perform simple routine tasks with limited interaction with coworkers and the public.  The ALJ

also gave some weight to Dr. Behniwal's determination that plaintiff had a GAF of 55 and Dr.

Behniwal's assessment that plaintiff could do simple and repetitive tasks, as well as perform

detailed and complex tasks.  *Id.*

Plaintiff argues that she was assessed with physical and mental impairments which could

reasonably be expected to produce the symptoms to which she testified, and she was not required

to prove the degree of severity; therefore, the ALJ erred in discrediting her testimony on that

basis.  *Id.* at 23.  Plaintiff also contends that although the ALJ found that plaintiff's daily

activities were not as limited as one would expect "given the complaints of disabling symptoms

and limitations," he failed to take into account the portion of Dr. Garg's report which notes that plaintiff "states when she is having panic attacks she feels tired and sleeps most of the day [and] when she has a large grand mal seizure she feels very tired, has headaches, and sleeps those days and [does] not do housework on those days." *Id.* (citing AR 119).  Plaintiff argues that "[t]he episodic nature of her impairments meant she was totally incapacitated while in the midst of seizures or panic attacks," and that those activities which she *is* able to perform "hardly constitute[] the activities of an active adult." *Id.* at 24.  She contends that there was no evidence of exaggerating or malingering, and the ALJ failed to articulate clear and convincing reasons for not crediting plaintiff's testimony regarding her functional limitations. *Id.* at 25.

Defendant counters that the ALJ properly considered and rejected plaintiff's allegations of subjectively disabling symptoms.  Def.'s Mot. for Summ. J. at 9.  Defendant contends that once a claimant has established an underlying medical impairment which could be reasonably expected to produce some subjective symptoms, an ALJ may consider various factors in assessing the credibility of the allegedly disabling subjective symptoms, including, *inter alia*, "the nature, location, onset, duration, frequency, radiation, and intensity" of any subjective symptoms; "type, dosage, effectiveness, and adverse side-effects" of any medication; "treatment, other than medication"; "functional restrictions"; "the claimant's daily activities"; "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment"; and "ordinary techniques of credibility evaluation." *Id.* at 10 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991), 20 C.F.R. § 416.929, SSR 96-7p).  Defendant argues that the ALJ gave valid reasons for finding that plaintiff's description of her subjective symptoms was "not entirely credible," including the inconsistency between plaintiff's alleged symptoms and her daily activities and the fact that various physicians had considered plaintiff's seizures and other medical problems and still opined that she retained some capacity for work activities. *Id.* at 10-11.

////

18

1        The ALJ determines whether a disability applicant is credible, and the court defers to the

2   ALJ's discretion if the ALJ used the proper process and provided proper reasons.  *See, e.g.,*

3   *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make

4   an explicit credibility finding.  *Albalos v. Sullivan*, 907 F.2d 871, 873-74 (9th Cir. 1990); *Rashad*

5   *v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

6   supported by "a specific, cogent reason for the disbelief").

7        The Ninth Circuit recently reiterated the two-step analysis that an ALJ must engage in

8   when determining whether a claimant's testimony regarding subjective pain or symptoms is

9   credible:

10              First, the ALJ must determine whether the claimant has presented
                objective medical evidence of an underlying impairment "which
11              could reasonably be expected to produce the pain or other
                symptoms alleged."  *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th
12              Cir.1991) (en banc) (internal quotation marks omitted).  The
                claimant, however, "need not show that her impairment could
13              reasonably be expected to cause the severity of the symptom she
                has alleged; she need only show that it could reasonably have
14              caused some degree of the symptom."  *Smolen v. Chater*, 80 F.3d
                1273, 1282 (9th Cir.1996).  "Thus, the ALJ may not reject
15              subjective symptom testimony ... simply because there is no
                showing that the impairment can reasonably produce the degree of
16              symptom alleged."  *Id.*; *see also Reddick*, 157 F.3d at 722 ("[T]he
                Commissioner may not discredit the claimant's testimony as to the
17              severity of symptoms merely because they are unsupported by
                objective medical evidence.").
18
                Second, if the claimant meets this first test, and there is no
19              evidence of malingering, "the ALJ can reject the claimant's
                testimony about the severity of her symptoms only by offering
20              specific, clear and convincing reasons for doing so."  *Smolen*, 80
                F.3d at 1281; *see also Robbins*, 466 F.3d at 883 ("[U]nless an ALJ
21              makes a finding of malingering based on affirmative evidence
                thereof, he or she may only find an applicant not credible by
22              making specific findings as to credibility and stating clear and
                convincing reasons for each.").
23

24   *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  To support a lack of credibility

25   finding, the ALJ must "point to specific facts in the record which demonstrate that [the claimant

26   is in less pain or the claimant's symptoms are less severe] than she claims."  *Vasquez v. Astrue*,

547 F.3d 1101, 1105 (9th Cir. 2008).

Here, in discrediting plaintiff's testimony, the ALJ noted that the extent of plaintiff's symptoms conflicted with the testimony regarding plaintiff's activities and the medical evidence in the record.  Specifically, the ALJ noted that the daily activities that plaintiff described – including cooking, vacuuming, mopping, helping with groceries, taking care of personal hygiene needs, caring for her children, watching television, cleaning, doing dishes, doing laundry, shopping, reading magazines, playing board games, and socializing with friends and family – are not limited to the extent one would expect them to be, given plaintiff's allegation that she experienced two to three seizures a month, that it took two to three days to recover from each episode, and that her seizure medications only provided "so-so" control, and her later allegation that she was having more frequent hallucinations and dreams, a worsening of panic attacks, and more frequent seizures.  AR 18.  The ALJ also found that plaintiff's claims were inconsistent "with the preponderance of the opinions and observations by medical doctors in this case."  AR 19.  Specifically, the ALJ cited Dr. Jaituni's finding that even with plaintiff's seizure disorder, plaintiff "could perform work tasks at the medium exertional level with seizure precautions including no climbing ladders, ropes, and scaffolds, and avoiding even moderate exposure to hazards such as machinery and heights"; Dr. Harrison's conclusion that by July 2006, the claimant would be able to sustain, adapt to, and perform simple routine tasks with limited interaction with coworkers and the public; and Dr. Behniwal's GAF score of 55 and assessment that plaintiff could perform both simple and repetitive tasks, and detailed and complex tasks.

Although it is true that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations," if the level of activity is inconsistent with a claimant's claimed limitations, the activities would have a bearing on the claimant's credibility. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (citing *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 530-531 (6th Cir. 1992)).  Here, the ALJ specifically stated that the extent of plaintiff's activities conflicted with her claimed limitations, and therefore found that the

alleged extent of those limitations was not credible.  That statement was supported by the

medical opinions that the ALJ cited.  Therefore, the court finds that the ALJ adequately provided

specific findings as to plaintiff's credibility and stated clear and convincing reasons for each.

Accordingly, plaintiff is not entitled to relief on this ground.

2.   <u>Plaintiff's Sister's Testimony</u>

In evaluating plaintiff's RFC, the ALJ also discredited the testimony of plaintiff's sister.

The ALJ stated:

> The third party statements of the claimant's sister do not establish
> that the claimant is disabled.  Since the claimant's sister makes no
> reference to being trained to make exacting observations as to
> dates, frequencies, types and degrees of medical signs and
> symptoms, or of the frequency or intensity of unusual moods or
> mannerisms, the accuracy of the third party statements is
> questionable.  Moreover, by virtue of the relationship as a sister of
> the claimant, she cannot be considered a disinterested third party
> whose statement would not tend to be colored by affection for the
> claimant and a natural tendency to agree with the symptoms and
> limitations the claimant alleges.  Most importantly, significant
> weight cannot be given to the third party's statements because
> they, like the claimant's are simply not consistent with the
> preponderance of the opinions and observations by medical
> doctors in this case.

AR 18-19.

Plaintiff contends that the ALJ erred in rejecting her sister's testimony regarding the

frequency and extent of her panic attacks and seizures.  Pl.'s Mot. for Summ. J. at 21, 26.

Plaintiff argues that her sister did not testify in a professional capacity, and instead provided

third party lay testimony reflecting her personal observations and experience with her sister's

impairments, as provided for in the Social Security regulations.  *Id.* at 26-27 (citing 42 C.F.R.

§ 416.913(e)).  Plaintiff also argues that the ALJ's implication that plaintiff's sister's testimony

could not be believed because of her familial relationship to plaintiff is "contra to the

Commissioner's own regulations and well as settled 9th Circuit law."  *Id.* at 27 (citing *Stout v.*

*Commissioner*, 454 F.3d 1050 (9th Cir. 2006)).  Finally, plaintiff contends that her sister's

testimony was consistent with the medical evidence.  *Id.*

21

1      Defendant counters that neither plaintiff's sister's written statement, nor her testimony,

2    addressed plaintiff's functional limitations.  Rather, plaintiff's sister described plaintiff's

3    seizures and stated that she helped plaintiff with various tasks.  Def.'s Mot. for Summ. J. at 11

4    (citing AR 114, 331-32).  Defendant contends that the ALJ expressly rejected those statements,

5    to the extent that they evidenced disability, because they were "simply not consistent with the

6    preponderance of the opinions and observations by medical doctors in this case."  *Id.* (citing AR

7    19).

8          "[L]ay witness testimony as to a claimant's symptoms or how an impairment affects

9    ability to work is competent evidence, and therefore cannot be disregarded without comment."

10   *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996); *see also Dodrill v. Shalala*, 12 F.3d 915,

11   918-19 (9th Cir. 1993) (friends and family members in a position to observe a plaintiff's

12   symptoms and daily activities are competent to testify to condition); 20 C.F.R. § 404.1513(d)(4)

13   (providing that evidence provided by lay witnesses may be used to show "the severity of [a

14   claimant's ] impairment(s) and how it affects [the claimant's] ability to work").  "If the ALJ

15   wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to

16   each witness."  *Dodrill*, 12 F.3d at 919; *see also Bruce v. Astrue*, 2009 WL 539945, at *1 (9th

17   Cir. Mar. 5, 2009) (finding that the ALJ erred in rejecting, without sufficient comment, the lay

18   witness testimony of the plaintiff's wife); *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1054 (9th

19   Cir. 2006) (finding that the ALJ erred by failing to consider the lay testimony of two witnesses

20   about how the plaintiff's impairments affected his ability to work).

21         Here, the ALJ did not ignore the testimony.  He specifically addressed plaintiff's sister's

22   statements and discredited them because, like plaintiff's testimony, the statements were "not

23   consistent with the preponderance of the opinions and observations by medical doctors in this

24   case."  AR 19.  As discussed above, Dr. Jaituni found that even with plaintiff's seizure disorder,

25   plaintiff "could perform work tasks at the medium exertional level with seizure precautions"; Dr.

26   Harrison concluded that by July 2006, the claimant would be able to sustain, adapt to, and

perform simple routine tasks with limited interaction with coworkers and the public; and Dr.
Behniwal gave plaintiff a GAF score of 55 and assessed that plaintiff could perform both simple
and repetitive tasks, and detailed and complex tasks.  Therefore, the ALJ's rejection of plaintiff's
sister's testimony was not improper.  Accordingly, plaintiff is not entitled to relief on this
ground.

        C.     <u>Failure to Properly Assess Plaintiff's RFC and Failure to Pose Legally Adequate</u>
            <u>Hypothetical</u>

      Lastly, plaintiff argues that the ALJ erred by failing to properly assess her RFC and
failing to pose a hypothetical to the VE which set out all of her limitations and restrictions.  Pl.'s
Mot. for Summ. J. at 28.  Plaintiff contends that the hypothetical that the ALJ credited was based
on his flawed RFC assessment.  Specifically, plaintiff contends, the hypothetical "failed to
reflect the episodic, debilitating nature of [her] seizures," and despite her testimony and her
sister's testimony, "the ALJ failed to ask the VE whether a hypothetical person would be able to
miss 5-7 days of work per month due to seizure activity [or] whether such a person would be
able to take unscheduled breaks to recover from a seizure."  *Id.* at 29.

      Defendant counters that the ALJ properly assessed plaintiff's functional limitations and
properly questioned the VE thereupon.  Def.'s Mot. for Summ. J. at 12.  Defendant specifically
disagrees with plaintiff's assertion that the ALJ should have found her to have the additional
functional limitations of missing work 5-7 days per month and of requiring unscheduled breaks
based on her testimony, her sister's statements, and the medical evidence, and contends that
substantial evidence supported the ALJ's findings as to plaintiff's functional limitations.  *Id.* at
13.

      Here, the ALJ found that plaintiff had "the residual functional capacity to perform
medium work except that the claimant cannot climb ladders, ropes, and scaffolds; cannot have
contact with hazards such as heights and moving machinery; can perform simple, routine tasks;
can have occasional public contact; and cannot perform jobs with high production quotas."  AR

17.  The ALJ supported this finding as follows:

> A Disability Determination Service ("DDS") consulting physician diagnosed the claimant with seizure disorder and concluded that the claimant could perform work tasks at the medium exertional level with seizure precautions including no climbing ladders, ropes, and scaffolds, and avoiding even moderate exposure to hazards such as machinery and heights.  The undersigned gives substantial weight to this opinion as it is consistent with the treatment record and the conclusions of a consultative examiner who diagnosed the claimant with seizure disorder and panic attacks with possible underlying depression.  This doctor also concluded that the claimant retained the ability to perform medium-level exertion with seizure precautions.
>
> In a mental residual functional capacity assessment form, a DDS physician concluded that by July 2006, the claimant would be able to sustain, adapt to, and perform simple routine tasks with limited interaction with coworkers and the public.  The undersigned accords great weight to this assessment as it is the most consistent with the record of the claimant's actual activities.
>
> An examining physician diagnosed the claimant with adjustment disorder with depressed mood and assigned the claimant a global assessment of functioning score of 55, a score which suggests moderate symptoms or moderate impairment in social, occupational, or school functioning.  The doctor noted that the claimant could do simple and repetitive tasks as well as perform detailed and complex tasks.  According to the examiner, the claimant might have mild difficulty interacting with coworkers and the public.  The doctor stated that the claimant would have moderate difficulty performing work activities on a consistent basis and maintaining regular attendance in the workplace, completing a normal workday/workweek, and dealing with usual stress encountered in competitive work.  The undersigned accords some weight to this assessment.  The limitations involving work stress, attendance, and performing and completing work tasks are not fully supported by the doctor's examination and by the record of the claimant's daily activities.

AR 19 (internal citations omitted).

The determination of a claimant's RFC is wholly within the province of the ALJ.  *See* SSR 96-8p.  The RFC assessment is based on all the evidence in the record, and it is the ALJ's duty to consider and weigh that evidence.  *See id.*  Here, the ALJ's RFC assessment was based on the opinions of Drs. Jaituni and Suster, AR 169-73 (medium work with no climbing of

1    ladders/ropes/scaffolds and avoiding even moderate exposure to hazards such as machinery and

2    heights because of seizures) and Dr. Harrison, AR 150-53 (simple repetitive tasks with limited

3    interaction with coworkers and public).  This finding also was largely consistent with the

4    opinions of Dr. Garg, AR 121-22 (capable of slightly less than medium work with no driving, no

5    working at heights, and no operating heavy machinery because of her seizures)) and even Dr.

6    Behniwal, AR 127 (can do both simple and complex tasks but "may" have mild difficulties

7    interacting with coworkers/public and will have moderate difficulties working consistently,

8    maintaining regular attendance, and dealing with usual stresses)), to whom the ALJ accorded

9    less weight.  AR 19.  These medical opinions constituted substantial evidence supporting the

10   ALJ's finding.

11          The ALJ posed the following hypothetical to the VE:

12                  [P]lease further assume that this individual could sit, stand, walk
                    six out of eight hours each in a normal eight hour workday, lift
13                  and/or carry a maximum of 55 pounds occasionally, 25 pounds
                    frequently, who could never climb ladders, ropes, or scaffolds,
14                  who would have to avoid even moderate exposure to hazards such
                    as moving, dangerous machinery and unprotected heights. And
15                  who could work at jobs involving simple, routine tasks with
                    occasional public contact, but no high volume production line jobs
16                  with high quotas. . . . Would there be any jobs that could be done
                    in the California economy [by] a person with those limitations, in
17                  your opinion?

18   AR 334-35.  This was an appropriate hypothetical based on the ALJ's ultimate interpretation of

19   the evidence.  The ALJ was not required to include limitations that he found to be unsupported

20   by substantial evidence in the record.  *See Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir.

21   1989) (ALJ is not bound to accept limitations that are not supported by substantial evidence);

22   *Embrey v. Bowen*, 849 F.2d 418, 422-23 (9th Cir. 1988) (hypothetical that ultimately serves as

23   the basis for the ALJ's determination must be supported by substantial evidence).  Hypothetical

24   questions posed to a vocational expert must set out all the substantial, supported limitations and

25   restrictions of the particular claimant.  *Magallanes*, 881 F.2d at 756.  Here, the ALJ's

26   hypothetical satisfied that requirement.  Therefore, plaintiff is not entitled to relief on this

ground.

VII.  <u>CONCLUSION</u>

In conclusion, the court finds that the ALJ's decision is supported by substantial evidence in the record and based on the proper legal standards.  Therefore, IT IS ORDERED that:

1.  Plaintiff's motion for summary judgment is denied;

2.  The Commissioner's cross-motion for summary judgment is granted; and

3. The Clerk is directed to enter judgment in the Commissioner's favor.

DATED:  September 30, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE